ARMOUR-CUDAHY PACKING COMPANY v. JOHN E. HART.

FILED FEBRUARY 1, 1893. No. 4424.

**Master and Servant**: JUSTIFICATION FOR DISCHARGE OF SERVANT BEFORE EXPIRATION OF TERM OF EMPLOYMENT: EVIDENCE. The plaintiff was employed for one year at a salary as superintendent and general manager of a large packing house, but was discharged before the expiration of the year. In an action to recover salary for the time after his discharge, *held*, that the proof showed such neglect of duty on his part as to justify his discharge.

ERROR from the district court of Douglas county. Tried below before HOPEWELL, J.

*Cowin & McHugh*, for plaintiff in error.

*M. V. Gannon* and *Brogan, Tunnicliff & Perley*, contra.

MAXWELL, CH. J.

About November 17, 1887, the defendant in error entered into the employment of the pla intiff in error as fore-

man and general manager for the plaintiff in error at South Omaha, such employment to continue for one year at a salary of $2,500 per year.   On the 28th of April, 1888, the defendant in error was notified by his employers that he would be discharged and to look out for other business. He was discharged early in June of that year but was paid up to July 1, 1888.   This action is brought to recover for the remainder of the year.   On the trial of the cause the jury returned a verdict in favor of the defendant in error for the sum of $833.33.   The errors assigned are that the verdict is against the weight of evidence and error in giving and refusing certain instructions.   The defendant in error testifies as to his duties as follows :

Q. What were your duties under your alleged employment with Mr. Cudahy; did you say what were your duties?

A. My duties, it was to oversee the working of the house; general foreman.

Q. Now, to oversee the whole business?

A. With the exception of the clerical part.

Q. What was that overseeing to consist of?

A. To see that the work was done properly.

Q. What work?

A. All the work of the house with the exception of the machinist department and the clerical department ; that I had nothing to do with.

Q. Slaughtering?

A. Yes, sir.

Q. You oversaw that?

A. Yes, sir.

Q. And the curing?

A. Yes, sir.

Mr. Cudahy testifies in regard to his duties as follows :

A. He had full charge of our house—the general working of it; the conducting of our business generally through the house.

Q. Now in detail, that would require him to do what?

A. That would require him to look after the killing, the cutting, the curing, the delivery of meats, the weights, and the business generally.

Q. Now, after he went to work, you may state in what manner he did his work from the first, and what conversations you had right along with him in regard to it.

A. Well, there were a great many things that appeared to me to be wrong.

Q. And that were wrong?

A. That were wrong.

By the court: It may stand if he goes on and specifies what was wrong.

\*        \*        \*        \*        \*        \*        \*

Q. Just go right on and speak about his work wherein that was wrong.

A. One time in the winter that we first opened up here I came here from Chicago and found that our hogs, the Saturday's killing, on Sunday, were all froze, and that means a great loss in cutting.

Q. How should they be kept?

A. They should be kept in a temperature probably about twenty.

Q. Now, to what extent was this?

A. It was one day's killing.

Q. How much would that be?

A. About 2,500 hogs.   And then another time——

Q. State what conversation you had with Hart about that.

A. Well, Hart was manager of the house, and I called him up and asked him why he let those hogs freeze, and why he did not put them in the chill room where they would not have frozen, and his reply—I do not remember what it was.

Q. What is the effect of that freezing?

A. The effect is that it would waste about twenty-five cents a hog, I think.

Q. Now state what else.   Go on after that.

A. At another time after that he put all the hogs into the chill room while the weather was mild outside and closed the chill room up, and on Monday morning the hogs were so stiff that it was very wasteful in cutting, and also there was a great risk in the curing.   The meat was in such a soft condition, and was kept in such a warm temperature that it was not safe to cure the meat.

Q. How much was there of that?

A. About 2,500 hogs.

Q. What did you say to him about that?

A. I brought him up into the chill room and asked him why it was so, and while it was 10 or 11 o'clock yet the windows were all closed, and I insisted upon the windows being opened then and there.

Q. What did he then say about that?

A. I do not recollect what his reply was.

Q. Now, what else?

A. Well, after that there was—that was during the winter, and then later in the spring, I one day made a thorough trip through the house, and I called Mr. Hart and told him that the house appeared to be in fairly good condition except one thing, and that was in the cellar.   I told him, now I wish you would attend to the cellar and feel it as your duty to look after that part of the house, and I will take care of the balance of it, and I do want you to take care of that.   Well, some time after that, in the course of twenty or thirty days, I went into the cellar, and they were delivering meat, and I asked the man in charge of that department if he was not inspecting the meat to see it was cured properly and that it was sweet on delivery, as we were having some complaints.   So I asked for a trier and inspected the meat myself, and found there was a large portion of it that was soured.

Q. What is that?   What does soured mean?

A. Soured meat is rejected.   It is off quality.

Q. What is the condition of it?

A. It is spoiled.

Q. What is that caused by?

A. It is caused by neglect, and caused by allowing the house to raise to a too high temperature, and then in not handling meat often enough. The meat, after it goes into salt, is handled from five to eight days afterwards and then it is turned again, and some of this meat I found run up to twelve or fourteen days without being handled.

Q. Did you speak to Hart, and what did he say about that?

A. After I found that meat was all bad, we had some, I think probably 3,000,000 pounds of meat in the house—dry salt meat.

Q. How much?

A. Three million, and I think there was seventy-five per cent of that that was bad. There was fully half of it anyway.

Q. What did Hart say about that?

A. Well, on that occasion, that was what I dismissed him for. That was one of the things.

Q. You may state, Mr. Cudahy, just your conversation with him when you dismissed him?

A. I told him that Mr. Armour objected to having him in our employ any longer, or that he would be employed in anything that he might be connected with. So I think Hart said that that was not quite right to discharge him for that. So I said, the amount of it is you are not running this business satisfactorily, and we cannot live under it.

Q. What was said in reply to that, if anything?

A. Well there was not anything.

Q. Do you know about what time that was?

A. Well it was in the spring sometime, I think; about sometime in May, and I told him I would extend his salary to the first of June. I think it was about the first of May.

Q. Was it extended afterwards?

A. I afterwards sent him to settle up some spoiled meat that was sent out under his supervision.

Q. Where was that sent?

A. To Memphis. Some four car-loads of meat, I think, it cost me about $1,000. I sent him to settle that up, and that carried him into a few days in June, and then I said we will extend your salary until the first of July.

Q. And that was a fact?

A. Yes, sir.

Q. Was there anything said to him about your helping him to get another place?

A. I told him that I would do anything that I could for him, and that he could always depend upon me and call upon me in case he needed anything—whenever he saw I could do anything for him I was perfectly willing and ready to do anything that I could for him.

In this testimony Cudahy is corroborated by a number of witnesses. In the testimony of the defendant in error in rebuttal he confirms many of the statements of Mr. Cudahy. Taking the testimony together it is clearly shown that the defendant in error did not attend to his duties faithfully and efficiently. It is true he attempts to excuse his failure by the statement that the works were new and the men not accustomed to the business, but this can be no excuse for the failure to perform his duty in March, 1888, and later. The works had been in constant operation from the month of November, 1887, and the men accustomed to their duties. It also appears that the defendant in error constantly used intoxicating liquors in considerable quantities, and permitted those foremen immediately under him to use such liquors. It is clearly shown that liquor for the use of the defendant in error and others was constantly kept at hand and was continually drank, thus the influence of the manager was given in favor of its use by subordinates and employes. The offense is much

more serious when committed by one in authority than by a mere laborer, as the example and influence of the manager is thus placed in favor of its use. With the amount of liquor shown to have been consumed by the defendant in error and his subordinates it is not a matter of surprise that duties were neglected and the plaintiff in error sustained loss. In our view the evidence shows so much neglect of duty on the part of the defendant in error as to justify his discharge. It is unnecessary to review the instructions.

The judgment is reversed and the cause remanded for further proceedings.

REVERSED AND REMANDED.

THE other judges concur.